2020-2021 Your Honors, today we are here seeking, well, appealing the dismissal of deliberate, two deliberate indifference claims against two frontline jail nurses, Tinoco and Tucker. And we are also appealing the dismissal of a failure to train, supervise, or discipline claim against St. Louis County and nurse managers Crancer and Hendricks. And we are also appealing the dismissal of the for having an unconstitutional policy and pattern, pervasive pattern, of not delivering medication to detainees in St. Louis County Jail, in addition to another policy of prohibiting nurses from calling 9-1-1, frontline nurses who encounter someone who has a serious medical need. Counsel, so you're not appealing as to Cedric Ivey, right? Oh, and Your Honor, we are appealing as to Cedric Ivey. I apologize and I appreciate that correction. Thank you. So, I think the first issue here is, I don't think anyone is really disputing what the law is. This is about the facts of the case. This is about factual disputes across the board on every issue, including the actual knowledge of the nurses and the notice and pattern and practice of St. Louis County and the knowledge of the supervisors. By constitutional design, the jury box important in our democracy sits beside the ballot box. One chooses our lawmakers and the other tests and provides legitimacy for our democracy. We don't believe that the jury is an ornamental issue. It's an instrument by which facts are tried and democratic legitimacy is maintained. Summary judgment is not a threshold or is a threshold. It's not a scale. And I think the error, the primary error in this case was the district court weighed evidence. Throughout the ruling, there was determinations and inferences that were drawn against the plaintiff and against the appellant. For example, when Nurse Hendricks testified that 20 people had died previously who had acute withdrawal syndrome, we thought it was apparent that she was essentially admitting that there was a substantial risk of serious harm in people who are in Stark's position who have AWS and admitting that 20 people had died in the past. However, the inference the district court drew was against the plaintiff. Now, we think that that shows the error, regarding the inferences. The court must view all the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences drawn from the facts, Robinson v. Moynihan, which we cited. And your honor, obviously this review is de novo. So let's go at this starting with the deliberate indifference and the actual knowledge of Tinoco and Tucker. So first of all, Tinoco and Tucker were frontline nurses who were ordered by the jail doctor to visit with detainees who were diagnosed with AWS. So we have Mr. Starks, in this case, who was diagnosed with AWS. The diagnosis provided that he was to be given medication three times a day and assessments, detailed assessments, checklists where you check all these various scenarios with him to make sure he can stand, all of that twice a day. These were done for the first two days, but then they were missed. And for 36 hours in a row, there was no assessments provided to Mr. Starks, no medication given, and then he would shortly die thereafter. However, after those two incidences where no medication was given by Tinoco and Tucker, he was found in his cell, on the floor by another nurse, Nurse Dalkor, who basically testified that she was not allowed to call 911. Even though she couldn't get a pulse, she couldn't palpate a pulse, she couldn't get blood pressure, and she also couldn't get a pulse oxygen reading, a blood oxygen reading. Now this is obviously a serious medical need, which the district court admitted and conceded was a serious medical need at that point. But the district court said that because he didn't find individual defendants constitutionally responsible that a Monell claim against St. Louis County for these unconstitutional policies couldn't be brought. We disagree. We couldn't disagree more. We believe that you don't need to find in the Eighth Circuit an individual defendant liable. Counsel, that's true, but there has to be an underlying constitutional violation, even if it's not against a specific individual defendant. And we agree with that. And we would say here in this case the underlying constitutional violation could be threefold. It could be Tinoco, it could be Tucker not giving the medication. Let's look at Tinoco and Tucker. And first of all, I'm sorry for your client's loss. The facts of this case are tragic. But in terms of the evidence, is there any evidence that Tinoco and Tucker even interacted with Mr. Starks? Is there a difference between gross negligence and deliberate indifference? And there isn't. And what we're saying here, our argument is, is that these nurses no-showed their patient. For example, if you're in the hospital and the doctor says, go see that person, and the nurse says, you know, I've got something else to do. I can't go. You know they have a serious medical need. You know that person needs an assessment. And you know that person needs medication. But you just decide you're not going to do that that day. That's deliberate indifference. And what case establishes that point that you just made, that that's deliberate indifference? Well, I think that all the cases in the past 15 or 20 years generally establish that you can use not only circumstantial evidence, but through decisions that are made to skip care, less efficacious care, just deciding not to, you know, render the services that you're supposed to render. I think there are several cases on point, and perhaps I can find them and come up and reserve some time and tell you what those are. But we have cases in our brief that show that a person doesn't need to see someone to see a serious medical need. All they have to do is know that the doctor says that there's a serious medical need. And their job as a frontline nurse is to service that need. And if they don't service that need, and this case doesn't get overturned and sent back, then nurses perhaps throughout the Eighth Circuit will feel as if they do not have to fulfill doctor's orders. Well, they can still be negligent. They can still have professional licensing discipline. That's sort of the... There could be that. Sure. Proceed. For sure. So, and Your Honor, there's lots of evidence and inferences. For example, Nurse Tucker put in her resignation a week after this. Now, that may not be direct evidence that she saw or knew any of this, but it's certainly an inference that can be created because St. Louis County, in this case, the most troubling, I think, aspect of this case was that St. Louis County did not do an investigation that they normally do when someone dies into the medical care that was provided to that person. That's called a morbidity and mortality review. We've seen many of them before with regard to many other deaths in St. Louis County. For whatever reason in this case, the morbidity and mortality review was either not conducted or it was conducted and then lost or destroyed, which is what we argued to the district court long ago that a morbidity... There was evidence that a morbidity and mortality review was being done because we have an email from, I believe, Kathy Duffy, who was in charge of doing the morbidity and mortality review who says, we are doing a review of the circumstances of care into inmate Drexel Starks. And she wrote this to the medical examiner's office. This is appendix 1595. We believe this is circumstantial evidence that there was a morbidity and mortality review done or at least a review done to determine who the nurses were that did not go see Mr. Starks on those two missing days. Now, when we sued, we would later find out... St. Louis County would later tell us, oh, that nurse was Teresa Pierce. They gave us the wrong nurse in litigation and we had to litigate against Teresa Pierce for, you know, that can't be her. That's impossible. St. Louis County has been playing with these documents providing us the wrong information claiming they didn't do a morbidity and mortality review report, which would have certainly figured out who the nurses were that did not give medication and assessments to Mr. Starks. St. Louis County knew and that's the other... One of the more important parts of this case in the Monell claim is St. Louis County knew from the very beginning in 2014 that there was a problem giving medications and assessments. They admitted it. It's in our brief. We have emails. We have everything else that says 75% of these aren't being done and we need to do a PDCA, a Planned Due Care Act document. It's a quality control measure. They admitted they didn't finish it. They admitted that they couldn't address it. Probably too widespread and pervasive of a problem. Nurses simply disregarding doctor's orders. Not showing up. Not taking blood pressures. And providing prescription medication, by the way, at the same time. Clonidine is a blood pressure medication. Now Starks presented with 10 out of 10 pain. He had low blood pressure. He had problems walking. He had problems with his gait. It was clear. Should have been clear to Ivy, as Ivy noted in his records, that he couldn't even get up off the floor. So Ivy said he had actual knowledge, obviously. Ivy said he couldn't get off the floor. He couldn't see his lawyer. And he refused to cooperate with medical. Now as you know, Your Honor, from the withdrawal checklist, you can't refuse to cooperate with medical when you're laying on the floor and you're too sick. In that case, the nurses are ordered they have to go in. You have to check on someone in that case because it could be a serious problem. So according to the withdrawal checklist... Counsel, you know you're in derivative. You can use it now. I am. You can use it now. Go ahead. And according to the withdrawal checklist, Your Honor, it says that nurse must call inmate out to assess. No call. No show. Not accepted. That was the direction to Tinoco and Tucker. And that goes to the deliberate indifference. They knew that the doctors had ordered not only to go in and see him and give him his medication because it's prescribed medication, but a no call, no show is not accepted. In other words, if he can't come out, you have to come in or officer must get inmate. So it shares the responsibility between the two nurses and Ivy. Now the two nurses said in their depositions, they admitted when people don't come out, they just mark it off as a refusal. So both of them in their deposition testimony admitted that they ignore this directive. So not only are they ignoring the doctor's orders to give assessments and medications, but they're also ordering the directive to go get the patient if they're too sick to get up off the floor. Or go in and check him and give him medication. And again, I think that goes to the deliberate indifference. And it goes to the lack of training. Because if they're admitting in their depositions well into this case that they consistently ignored these medical directives, then they're essentially admitting they weren't trained and they weren't supervised by Hendricks, Crancer and St. Louis County to do the right thing. To go in and make sure the medication was provided. So that there wouldn't be a 30 hour gap in time in which Mr. Starks would die. And with that, I'd like to reserve the rest of my time. You may reserve the 2 minutes 12 seconds. Ms. Britt. Good morning, Your Honors. Associate County Counselor Portia Britt here on behalf of Appellee Cedric Ivey in St. Louis County. May it please the Court. What did you know and what did you do? These questions lay the framework for any claim of deliberate indifference. On August 6, 2015, Appellee Cedric Ivey knew that he started his shift as a corrections officer at approximately 6 a.m. He knew that he was assigned to Housing Unit 8A after not being assigned to that unit on August 4th or 5th. He knew he conducted multiple tours of 8A during his shift. And he knew that at some point in the afternoon of August 6th, he interacted with a detainee, Mr. Drexel Starks. And then Mr. Starks refused to cooperate with medical, refused a legal visit, told Officer Ivey he was not getting up, and refused to eat his lunch tray. Appellant attempts to impute knowledge of Mr. Starks and his medical condition to Appellee Ivey based on alleged exposure to Mr. Starks' medical records. But the evidence demonstrates corrections officers do not have access to detainee medical records. Appellant also claims Appellee Ivey was exposed to Mr. Starks' inmate records, which noted that on August 4th, Mr. Starks was observed vomiting and was placed on drug detox. But there is no evidence Appellee Ivey or someone on his behalf ever accessed Mr. Starks' inmate records prior to 2.08 p.m. on August 6th. After a thorough examination of the evidence put before it in the parties' respective motions for summary judgment, the Honorable Judge Ronnie L. White issued a detailed 38-page analysis of the facts of this case and correctly observed that even accepting all of Appellant's wide-ranging allegations and theories as true, Appellant failed to produce evidence that Appellee Ivey or any of the named appellees for that matter had actual knowledge of Mr. Starks' medical condition, serious or otherwise, prior to August 6th, 2015 and were deliberately indifferent to it. But they are supposed to follow doctor's orders. You know, often the nurse does not know anything about – not anything, it's an exaggeration – doesn't know everything about a person's records, but they're supposed to follow the doctor's orders. What about the allegation as emphasized by him that they didn't follow the doctor's orders? Yes, Your Honor, I don't want to get too much into that because they do have their own counsel, so I don't want to take from his argument, but Your Honor – Well, do Ivey talk about Ivey? That – yes, Your Honor. Even if Ivey didn't know about the records, he's still supposed to make the rounds. That – and the evidence shows that he did make the rounds, Your Honor. The jail logs represent that he made the tours every 30 minutes as required by jail policy. Well, in terms of St. Louis County, were you enforcing the policy that said that the nurses are supposed to follow the doctor's orders? You saw the report he talked about and the other evidence he cites. Correct, Your Honor. And the fact is that multiple witnesses, including defendants that were dropped from this case testified that St. Louis County nurses were being trained about the policy. Nurse Rita – or appellee Rita Hendricks testified at her deposition that they did a monthly audit of patient files to make sure that policies were being followed. In fact, the 2014 PDCA, which is a tenuous connection to August 2015 from March 2014, actually shows that St. Louis County was not being deliberately indifferent to the needs of inmates because, again, they were reviewing inmate charts. They were putting measures in place to assist detainees with the uncomfortable symptoms of withdrawal. And Nurse Hendricks also testified that whenever it was discovered that a patient – or that a nurse was not providing care as required, they would have a talk with that nurse. Perhaps Appellant disagrees that there should have been – or thinks that there should have been more discipline. However, there is no evidence that St. Louis County or its supervisors or employees were deliberately indifferent. Counsel, would you agree that when a detainee court refuses to cooperate, it might actually be an indication of a serious medical condition? The only thing you said that I had concern with was that you seemed to equate a situation where a detainee refuses to cooperate with somehow evidence that there's no deliberate indifference. In fact, it could be evidence that the inmate is in distress. No, Your Honor. I apologize. That was not my indifference. Certainly, an detainee could refuse medical attention because he or she is not feeling well. However, I think that in this case in particular, that does not appear to be what happened. One, the note is vague as to when exactly this occurred. We have to assume it occurred on or around 2.08 p.m. But also, there's no evidence in the record of Mr. Stark's medical condition at the time he interacted with Officer Ivey. So it really gets to Officer Ivey's knowledge as to how he could have been deliberately indifferent to something he was unaware of. And the facts from all witnesses in this case speak to the fact that withdrawal was a common thing in the jail, where the jail was bringing in thousands of detainees per year or I shouldn't say bringing in, but holding thousands of detainees per year. And this was not a common occurrence of people dying. And isn't that really the problem here is that there is no expert testimony that the AWS was a serious medical condition in this circumstance? Well, I certainly think that is one of the problems. As an appellant's own expert testified that it's uncomfortable but he can't remember anybody dying from AWS. But it can be a serious medical condition. Your Honor, I would say that no courts have found that withdrawal, at least to appellee's knowledge that withdrawal in and of itself is a serious medical condition. However, we do recognize and concede that symptoms of withdrawal, if an individual actually experiences those particular symptoms like dehydration, can certainly become severe. But no court has found and there's not evidence in the record that withdrawal in and of itself is automatically a serious condition. So that would be our position. The district court did not air in its determination that individual appellees were entitled to summary judgment as a matter of law and that appellee county could not be liable under Monell. In fact, the district court in determining whether Mr. Starks had an objectively serious medical need did a thorough examination of whether Mr. Starks' condition was obvious to a lay person, whether Mr. Starks was diagnosed by a physician, and whether the medical evidence supported a finding that Mr. Starks had a serious medical need. In evaluating all of this, the court looked at Mr. Starks' conditions on August 4th, demonstrating that when he came into the jail, he did state that he used opioids daily and was dope sick and based on this, Nurse Heitman placed him on the Clonidine protocol. At the time, he was not in acute distress, had a pulse rate of 101, only one point above the normal range of 60 to 100 beats per minute and his blood pressure was 122 over 96. He was able to effectively communicate with Nurse Heitman, was ambulatory and signed his medical acceptance form. Based on this information, as well as the fact that the evaluation of Mr. Starks that evening demonstrated that his symptoms were stable, he did have a blood pressure of 90 over 60, his speech was clear and his eyes, hands and tongue were steady, though he did have an unsteady gait and dry mouth. Based on this information and the fact that at night while he was in his cell, he would have had access to water via the sink in his cell as well as an emergency call button to contact correctional officers if needed, the court properly determined that he did not have an objectively serious medical need on August 4th. Similarly, on August 5th, when he was evaluated by Nurse Sussman sometime on or after 9.40 a.m., Nurse Sussman noted that Mr. Starks' condition seemed to be improving. His blood pressure was 90 over 50. His symptoms were normal per Appellant's own expert. His symptoms were normal at the time he was evaluated by Nurse Sussman and there is no evidence he refused any meals on August 5th. Similarly, for August 6th, there is no evidence Mr. Starks had a serious medical need prior to 2 p.m. Further, Appellant discusses reasonable inferences and the evidence in this case shows that when Mr. Starks was found on the floor of his cell at 2 p.m., based on all of the testimony in the records, county officials immediately responded to aid Mr. Starks, creating the reasonable inference that if he had been observed in distress prior to this time, they would have rendered aid at that time. Based on this, the District Court again determined that there was no evidence to support the assertion Mr. Starks had an objectively serious medical need prior to 2 p.m. As Appellant has not established evidence that any of the individual appellees violated Mr. Starks' constitutional rights, this Court need not evaluate Appellant's Monell claims. Deliberate indifference must be measured by... You heard Judge Gross' question earlier. There can be Monell when the other defendants all get off because they had nothing to do with it, but boy, something bad happened and a training supervisor would have prevented it. Surely there can be a Monell claim, a freestanding claim, and the Supreme Court has evaluated freestanding Monell claims. Fair enough, Your Honor, but again, the evidence in this case does not demonstrate that Mr. Starks had an objectively serious medical need prior to 2 p.m. on August 6, 2015. The evidence also does not suggest that appellees, any of them, were aware of Mr. Starks' medical need and deliberately disregarded it. So as there is no evidence of an underlying constitutional violation, this Court still need not evaluate Appellant's Monell claims. With that, Your Honor, I would close by saying at the summary judgment stage before the evidence is left to the jury, the preliminary question for the judge is not whether there is literally no evidence, but whether there is any evidence upon which a jury could properly find in favor of the non-moving party. In this case, the District Court determined there was no such evidence and therefore granted summary judgment to appellees. County appellees ask that you affirm the findings of the District Court. Thank you, Counsel. Mr. Cody. May it please the Court. Proceed. Good morning, Your Honors. I am representing the nurse defendants in this case, Reginald Tinoco, Deborah Tucker, Rita Hendricks, and Faye Crancer. I think the primary issue in this case is in order for the plaintiff to demonstrate a claim of deliberate indifference against the nurse defendants, in particular Mr. Tinoco and Ms. Tucker, there is a requirement to show subjective actual knowledge of Mr. Stark's medical condition. There was no evidence presented in the District Court to demonstrate that the nurses had subjective actual knowledge of his condition. There was further no evidence provided as to what Mr. Stark's condition was at the times that the allegation is that Mr. Tinoco and Ms. Tucker were supposed to have seen him The evidence demonstrates, for example, that when he was seen on the morning of August 5th, his condition had improved from the night before. All of his symptoms were normal. He was in good condition. He was not showing any symptoms of dehydration, withdrawal. How many hours before the death, before Ivy finds him on the floor? Better statement, before Ivy finds him on the floor. That would have been the morning of the day before. The morning of the day before? Yes, on August 5th. That is true, Your Honor. When he was found in the late afternoon of August 6th, his condition certainly had changed. The important point, Your Honor, is that when Mr. Tinoco and Ms. Tucker are alleged they were supposed to have seen him on the evening of August 5th and the morning of August 6th, there has been no evidence provided as to what his condition was at that time or that he was in any kind of serious medical need. As Your Honor pointed out, there has been no expert testimony provided as to acute withdrawal being generally speaking a serious medical need, absent some evidence of what symptoms were. Further, even if we assume that he was in some kind of serious medical need, there has been no evidence presented that the nurses, Mr. Tinoco and Ms. Tucker, had actual knowledge of that need. The full extent of the claim against them is that the evidence shows they were on the floor of Mr. Starks on August 5th and August 6th. No witnesses testified as to who they saw on the floor, what kind of treatment they provided to anybody on that floor. There is evidence of other nurses being on the floor at those relevant times, specifically testimony that another nurse was in the same unit doing withdrawal assessments on the morning of August 6th. That was not Nurse Tucker. There is no evidence that the nurses observed the medical record at any time. In fact, the metadata that was presented to the court that shows every time that somebody accessed the medical record to look at it, demonstrates that neither Mr. Tinoco or Ms. Tucker accessed those medical records at any point in time prior to Mr. Starks being taken out of the jail and sent to the emergency room. District Court seemed to be of the view that only a physician can diagnose a serious medical need. What's your opinion of that? I believe that the case law does say that a physician can diagnose a serious Your clients are nurses. Can they not diagnose serious medical needs? No, Your Honor. The testimony is that it is outside the scope of a nurse's practice to diagnose a condition. You looked at the Nursing Practices Act, correct? I'm sorry, Your Honor? You looked at the Nursing Practices Act, at the acts they can take, correct? I am not sure of the exact scope of their practice. Neither Mr. Tinoco or Ms. Tucker would have been the ones diagnosing any condition in this case. The fact remains that there has been no evidence of what any of the symptoms were. No evidence that they had any knowledge of Mr. Starks or his condition. I would add that the failure to supervise claim against Nurses Hendricks and Crancer has to automatically fail absent evidence of a constitutional violation by Reginald Tinoco or Deborah Tucker and absent evidence of a pattern of constitutional violations by Mr. Tinoco and Ms. Tucker. Thank you for the argument. Thank you. Mr. Pedroli. Your Honor, the serious medical need was the doctor's orders. It was the prescribed medication. Let's go back to 1976. The Supreme Court ruled in Estelle v. Gamble. One, intentionally denying. Two, delaying. Or three, interfering with prescribed treatment. Interfering with prescribed treatment. That's what we have here. What was prescribed treatment? Was the checking in on? There's two forms. The twice a day assessments, detailed assessments, and the three times a day medication. One of the medications to prevent dehydration. The other one, prescription medication for Clonidine. This is serious stuff. It's not just comfort meds. The prescription was described as for comfort though, wasn't it? Well, that's how the district court described it. We don't describe it as comfort. Well, I know you don't, but what does the record show? Well, I don't know who first inserted the word comfort. I don't know where that comes from. But, I think St. Louis County calls it comfort meds, but it's dehydration meds. It's to prevent death. It's to prevent a dehydration death. Which is what he died of in this case. They didn't get those medications. Those medications were prescribed. Estelle V. Gamble says, you don't need anything more than that. You don't need then more evidence of it beyond the prescription. This is interfering with prescription. Both IV and Tinoco and Tucker, no showing in ignoring the doctor is interference that goes all the way back to Estelle V. Gamble. You don't need anything else on top of that. But, we have it. 10 out of 10 pain, vomiting, sickness. We have Hendrick saying 100% of the time there's vomiting and diarrhea that needs dehydration. She said that's why we have the standing orders. As to IV, he did know. In the IJMS records, he didn't just do TORS. He looked at the IJMS record and it said at the top, Stark's was on acute withdrawal. Meaning he needed to go out to see the nurse. That's why he wrote he refused to cooperate with medical. Because he did know. Because there's IJMS records and Tinoco and Tucker also knew. Because they knew they were at the floor. They were in the floor. It showed them there. They were supposed to see him and they weren't supposed to let him stay in his cell. That was the orders from the doctors. That was national standards. They ignored it. And they said they always did. Thank you, Your Honor. Thank you, counsel, for the argument. Case 24-2540 is submitted for decision by the court.